United States Bankruptcy Court
Eastern District of Michigan
Southern Division

In re:

WILLIAM STOYANOVICH,

              Debtor,
_____/

Case No. 11-41849
Chapter 7
Hon. Walter Shapero

DALE LENTZ and KEVIN CAMPBELL,

              Plaintiffs,

v.

WILLIAM STOYANOVICH,

              Defendant.
_____/

Adv. No. 11-05381

**OPINION**

This matter is before the Court for a determination of whether a debt based upon a state court judgment in favor of Plaintiffs and against Defendant is dischargeable under 11 U.S.C. § 523(a)(2)(A).

**Background and Facts**

During all times relevant to this proceeding, Defendant William Stoyanovich (hereinafter "Debtor") and his cousin Joey Stoyanovich were the minority owners, and Debtor's brother Peter Stoyanovich was the majority owner, of Kickers All American Grill, Inc. (hereinafter "Kickers"). Kickers operated a facility that includes a restaurant, comedy club, martini bar, and nightclub located in Livonia, Michigan.

Peter Stoyanovich was a place kicker in the National Football League from 1989 to 2000. While he was playing apparently Peter, along with his brother and cousin,

1

opened up Kickers. The involved business entities consisted of Spiro and Sons, Inc. (hereinafter "Spiro"), a corporation which owned the land and building which housed the business, and Kickers, which operated the business and leased the premises from Spiro. Peter was the oldest and essentially was the president and principal operating officer; Debtor was younger and was essentially a manager of the business. Spiro and Kickers financed the business by way of a term loan and a line of credit from Fifth Third Bank.

As of the beginning of 2006 and previously, the business had been apparently successful. Dale Lentz and Kevin Campbell ("Plaintiffs" or "Lentz" or "Campbell") were in the construction business together and had become socially friendly with Peter and Debtor by reason of playing golf together and frequenting the restaurant. At some point, apparently Plaintiffs expressed an interest in becoming part of the ownership of the business (or possibly they were asked to do so – it is not clear).

During 2005 and 2006, Lentz individually loaned a total of $250,000 to Peter personally, for the original purpose of enabling the latter to complete construction of a new home. The evidence of any repayment obligation was an oral agreement to do so, the original specific repayment terms of which are not in evidence.

By the middle of 2006, Kickers was experiencing financial difficulties and needed additional capital or an infusion of funds to both reduce the balances of, and, pay-off various certain other outstanding liabilities. The largest of these liabilities consisted of an outstanding loan of approximately $2,400,000 (calling for monthly payments of some $20,000) and a line of credit of approximately $50,000, both owed, as noted, to Fifth Third Bank.

Sometime in the spring of 2006, discussions commenced about Plaintiffs putting some $1,700,000 in the enterprise. There were a (disputed) number of meetings on the subject, some where Peter and William and Lentz were present, some where only William and Lentz were, and some which were also attended by Campbell. One such meeting occurred in June or July of 2006 (hereinafter the "Summer Meeting"), attended by both Plaintiffs, Debtor, and Peter, during which Debtor discussed with Plaintiffs a proposed "investment" of $1.7 million in Kickers.

Incident to the Summer Meeting, Debtor prepared and showed Plaintiffs a handwritten informal "Offer Sheet" document (Exhibit 7) that among other things, indicated what liabilities they intended to satisfy with the $1.7 million. They were: (a) $1,000,000 to go toward reducing the balance on the $2,400,000 Fifth Third Bank loan; (b) $380,000 to completely discharge an indebtedness to Joey Stoyanovich which had resulted from a settled lawsuit; (c) $95,000 to repay a debt owed to Debtor; (d) $100,000 to satisfy a liability to the state resulting from a state sales tax audit; (e) $50,000 to pay off the Fifth Third Bank line of credit; (f) $40,000 for unpaid business property taxes; and (g) $20,000 to one of Kickers' creditors (Lasers).

Soon thereafter Plaintiffs transferred $1,450,000 to Kickers, by way of checks for $400,000 on June 23, 2006 (initially paid to Peter but transferred to or for the benefit of Kickers by him); $1,000,000 on July 16, 2006; and $50,000 on August 15, 2006. Plaintiffs contend (and the Court concludes such was consented to by all parties) that as part of the overall arrangement Peter's obligation to repay the $250,000 loan for the house was to be folded into and become, part of the total involved $1,700,000 infusion. Peter also contends that in any event the repayment of that $250,000 obligation was

contingent on his receiving sufficient funds from the sale of his existing home to pay this amount.

Plaintiffs testified that before issuing the first check they did not seek on their own behalf any professional advice or review concerning the financial condition of Kickers. However, it is acknowledged that Kickers' accountant somewhat contemporaneously provided Plaintiffs with detailed financial statements of Kickers covering 2004 and 2005 (Exhibit 17). There was conflicting testimony as to whether the Summer Meeting took place before or after the initial $400,000 check was issued by Plaintiffs on June 23, 2006.

Evidence at trial established that during the summer or fall of 2006, after receiving the monies from Plaintiffs, Kickers paid (a) $55,000 of its obligation to Joey Stoyanovich; (b) $95,000 to satisfy in full its obligation to Debtor; (c) approximately $80,000 toward past due sales taxes; (d) approximately $33,000 toward back property taxes; and (e) approximately $50,000 to pay off the Fifth Third Bank line of credit. Also, on September 8, 2006, out of the funds paid by Plaintiffs, Kickers paid $796,385.57 to Fifth Third Bank incident to refinancing its then outstanding loan from Fifth Third Bank, leaving $1,650,000 owed to that bank (Exhibit 12). These payments in toto amounted to $1,109,385.57. That same day (some two months after the Summer Meeting) Kickers loaned $100,000 to Peter and $60,000 to Debtor.

Also relevant is Exhibit 8 which is a cover sheet to a fax dated August 18, 2006 from the attorney for Kickers (who Lentz indicated he thought was also representing he and Campbell in connection with the transaction) to Lentz, which says "pursuant to instruction from Billy Stoyanovich, faxed herewith is the Purchase Agreement and Stock

Purchase Agreement." The referred to agreements for some reason are not part of the exhibit. Lentz testified that he did receive that fax and the referred to agreements, and, that some longhand notes on that exhibit were his. There is no evidence that any written purchase agreement was ever signed by the parties and there is no specific testimony as to any follow up with reference to Exhibit 8 or its referred to agreements. However, there is evidence that in August 2006, stock certificates representing interests in either or both of Spiro and Kickers (together representing a 1/3 interest in those entities) in the names of Lentz and Campbell, were either delivered to, or picked up by, Lentz. In any event, however sometime in the latter part of 2006, on advice of their attorney, the application to the Michigan Liquor Control Commission for approval of Lentz and Campbell as stockholders of Kickers was withdrawn and the transaction was thereafter considered and treated by the parties as akin to a loan transaction.

The contemplated principal reduction on the existing loan with Fifth Third Bank was effectuated by way, and took the form, of a refinancing of that existing loan. The closing on that refinancing transaction took place on September 8, 2006 at the Kickers premises. Peter, Debtor, Lentz, Campbell, the bank loan officer, and maybe others, had lunch in the restaurant and then adjourned to the adjoining patio where the actual closing documents were signed. Present on the patio were the Fifth Third Bank loan officer, Peter, and Debtor. Peter testified that Lentz appeared at the closing table on the patio from time to time during the closing. What was signed was Exhibit A, the settlement statement, the new note to the bank, and possibly other documents requiring the signatures of Peter and Debtor. Apparently, the pre-existing loan obligor was Kickers, and Peter, Debtor, and Spiro were its guarantors. The refinanced loan transaction shows

that Peter and Debtor became the primary obligors to the bank on the note, which is entitled "Real Estate Mortgage Note" (note that Spiro and not Kickers owned the real estate), and recites that it is secured by a certain guaranty and other assignments. The referred to guaranty and other assignments are not in evidence. The note is for $1,650,000 payable in 60 monthly payments of $15,295.70, including interest commencing November 1, 2006. Peter testified that at the closing he was surprised that the paperwork made he and William the primary obligors on the note, rather than it being Kickers, and that when he asked about it the loan officer indicated it was Lentz who was responsible for it being structured that way. At any rate, Peter said they had no problem with that and the closing proceeded. The settlement statement indicates there was a payoff of the existing Kickers loan of $2,400,290.21 and that the new loan was $1,650,000 and that the borrower put in funds to apply to the loan reduction of $796,385.57, by way of a transfer of funds which came from the Kickers account or accounts, which in turn presumably came from the funds paid in by Plaintiffs.

As noted, Exhibit 7 indicated the bank loan's then approximate balance of some $2,400,000 was going to be reduced by $1,000,000. If it were, presumably the new balance would have become $1,400,000. It turned out that as of time of the closing of the refinancing, the new balance became $1,650,000. Peter testified, as noted, that there was an expectation that he would be clearing some $250,000 from a sale of his existing home, and that money would be paid to the bank to reduce the loan balance, thus essentially accounting for the difference between the $1,000,000 referred to in Exhibit 7, and the lesser actual reduction at the loan refinance closing of the principal balance. As also noted there was further credible testimony that such was fully understood at the closing

and including that it was dependent on Peter actually selling the house and realizing that amount to apply to the loan. There was no agreement, discussion or commitment as to what would happen if such a sale did not occur or, if it did, what would happen if the $250,000 was not fully realized from any such sale. As in fact happened the house was eventually sold but Peter realized little or nothing over the liens required to have been paid incident to the sale.

Exhibit 7 includes not only an indication of the uses to which the funds were going to be put, but also contains a calculation of estimated profits, in light of the reduction of the monthly payments to the bank on the anticipated reduced loan, plus other changes, the result of which would make available for distribution to Lentz and Campbell some $15,000 per month. According to their notations in that document that amount represented an 18% annual return on their money. According to the testimony, commencing in September or October 2006, Kickers paid out monthly to Lentz and Campbell the indicated $15,000 (and possibly other sums as well) until about April of 2007 when as hereinafter noted the relationship fell apart. There was also some testimony that Lentz and Campbell put in some additional monies in the fall of 2006 and when asked why they did that, Lentz said (likely in retrospect) it was "absolutely stupid" to have done so. Peter testified that Lentz and Campbell, being general contractors, were also supposed to perform maintenance on the property as part of the deal, which they did.

Also incident to the arrangement, Kickers hired a daughter of Lentz who was just out of college, who worked in some sort of managerial capacity, receiving compensation of some $3,500 per month (that is also noted in Exhibit 7). She had authority to write

11-05381-wsd    Doc 63    Filed 10/11/12    Entered 10/11/12 17:30:27    Page 7 of 17

checks out of the Kickers account for business expenses and Lentz had authority to review the bank statements (but had no authority to write checks).

Kickers' business started to worsen early in 2007 to the point that in March or April of 2007 Peter proposed a decrease in the amounts being paid out to himself, Debtor, and Lentz, and that Lentz's daughter be let go. Fifth Third Bank in particular, and also maybe others, were then pressing for payments. This led to an argument and disagreements among the parties, the results of which were that payments to Lentz and Campbell ceased, Lentz's daughter left, and apparently the parties ceased being on speaking terms. Sometime after this, the bank exercised its foreclosure and security interest rights, and a receiver was appointed. As a result Peter, Debtor, Lentz, and Campbell lost whatever interests in the assets of the enterprise they had or claimed.

The subject debt in this case, as is shown by the proofs of claim filed by Lentz and Campbell, is based on a state court consent judgment in their favor in the amount of $2,035,126.33 entered against Peter and Debtor, jointly and severally, dated September 4, 2009, in a state court case commenced in 2007, in which Kickers and Spiro were also original defendants. The record in this case does not indicate what the basis was for the claimed individual liability of Debtor or whether or not in that proceeding there were any allegations of fraud or claims similar to those made in this proceeding or how the indicated judgment amount was calculated. Neither party has invoked collateral estoppel or res judicata by reason of that state court proceeding.

It is the Plaintiffs' theory primarily that the debt should be held non-dischargeable because what was stated in Exhibit 7 were representations that (1) the bank loan would be reduced by $1,000,000, whereas in fact it was only reduced by less; and

8

11-05381-wsd    Doc 63    Filed 10/11/12    Entered 10/11/12 17:30:27    Page 8 of 17

(2) out of the monies paid in, only certain sums would be paid to Peter and Debtor, and in fact more than such were in fact paid to them; and (3) $380,000 would be paid to Joey, when in fact such was not done; the evidence on that latter point being that Peter made an agreement with Joey not to pay him off then, but to pay him over time; Peter credibly said Lentz knew about that agreement and approved it.

### Discussion and Conclusions

Section 523(a)(2)(A) excepts from bankruptcy discharge those obligations arising from conduct that amounts to "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Plaintiffs argue actual fraud and false representations, both of which require proving actual or positive fraud, not fraud that is implied by law. Actual fraud consists of "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Mellon Bank, N.A. v. Vitanovich*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). False representation, or misrepresentation, is given its ordinary meaning. *See In re Hermoyian*, 466 B.R. 348, 364 (Bankr. E.D. Mich. 2012).

The elements of a cause of action under § 523(a)(2)(A) appear in *Rembert v. AT&T Universal Card Servs., Inc.*, 141 F.3d 277, 280-81 (6th Cir. 1998), where the Court stated that to except a debt from discharge under § 523(a)(2)(A), a creditor must prove each of the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor

justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. The creditor must prove each of these elements by a preponderance of the evidence. *Rembert*, 141 F.3d at 281. Moreover, exceptions to discharge are to be strictly construed against the creditor. *Manufacturer's Hanover Trust v. Ward*, 857 F.2d 1082, 1083 (6th Cir. 1988).

The first of these elements require that the debtor has knowledge of the falsity when the representation is made or acted with a reckless disregard as to its truth or falsity. *Brady v. McAllister*, 101 F.3d 1165, 1172 (6th Cir. 1996). Generally, it involves an affirmative or overt statement sufficiently definite to create an impression that is conducive to action, though a debtor's silence with respect to or concealment of a material fact can also be actionable under § 523(a)(2)(A). *Fowler Bros. v. Young*, 91 F.3d 1367, 1375 (10th Cir. 1996). Although the test is subjective, the debtor's knowledge of the truth or falsity of a representation at the time it was made may be inferred from conduct. *Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir. 1996).

The second element (intent to deceive) has much in common with the first element, but it focuses on the debtor's intention to induce action at the time of the representation. *In re Gould*, 73 B.R. 225 (Bankr. N.D.N.Y. 1987). Intent to deceive is rarely admitted, so it is usually inferred from circumstantial evidence and implausible testimony. *In re Sholdra*, 249 F.3d 380, 382 (5th Cir. 2001) ("statements made with fraudulent intent – or reckless indifference to the truth . . . can be proven by circumstantial evidence"). Intent may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor; and a mere unsupported declaration of an honest intent will not overcome a

10
11-05381-wsd    Doc 63    Filed 10/11/12    Entered 10/11/12 17:30:27    Page 10 of 17

picture of events evidencing a deceptive state of mind. *In re Wood*, 458 B.R. 898 (E.D. Mich. 2011).

Finally, note should be taken of the following which the Court deems applicable to this proceeding:

(a) "[I]t is well established that the greater the extent of a debtor's performance, the less likely it is that they possessed an intent to deceive." *In re Bennett,* 430 B.R. 463, 469 (Bankr. N.D. Ohio 2010), quoting *Anastas v. Am. Sav. Bank,* 94 F.3d 1280, 1285 (9th Cir. 1996). Some courts have even held that any partial payment on a debt mitigates heavily against a finding of intent to deceive. *Oetker v. Bullington*, 167 B.R. 157, 161 (Bankr. W.D. Mo. 1994). For example, the court in *Busch, Inc. v. Grilliot*, 293 B.R. 725, 731 (Bankr. N.D. Ohio 2002), found that the debtor lacked the requisite fraudulent intent because she paid $700 of a $9,600 debt; and

(b) This Court's language in *Michigan Steel Erectors Inc. v. Crane*, 154 B.R. 60, 64 (Bankr. E.D. Mich 1993):

> "Generally speaking, in order for there to be an actionable fraud the representation made must relate to a matter of fact, ordinarily a past or existing fact, and may not be based upon the mere failure to perform a promise or an agreement to do something at a future time. *See e.g. Broaden v. Doncea*, 340 Mich. 564, 571, 66 N.W.2d 216 (1954). Or put differently, the basis for the action must exist at the time the debt arose or the transaction was entered into. *See e.g. In ve Vissers*, 21 B.R. 638 (Bankr. E.D. Wis. 1982). An exception arises where and if plaintiff could show that at the time debtor said he would pay plaintiff when he received the money, the debtor's undisclosed and then present intent was not to do so. *See Rutan v. Straehly*, 289 Mich. 341, 348-349, 286 N.W. 639 (1939). The fact that debtor did not eventually pay plaintiff does not perforce establish that debtor had no intention of doing so in the beginning, or at the time the contract was made."

This Court has concluded that Plaintiffs have failed to bear their burden of proof and that in fact the totality of the evidence requires the conclusion that the statements

11

11-05381-wsd    Doc 63    Filed 10/11/12    Entered 10/11/12 17:30:27    Page 11 of 17

made in Exhibit 7 (if in fact they can even be considered as representations and not mere contract conditions which are not in and of themselves actionable under § 523(a)(2)(A)) at the time and when made were not false, untrue or misleading and were in fact, and at that time made, and intended to be carried out as initially stated. Generally speaking this is borne out by the totality of what happened afterward and over the course of time, including the knowledgeably condoning and approving actions of the Plaintiffs as to ensuing course of events.

A somewhat relevant but certainly not crucial consideration is that at the time the transaction was initially structured it was intended to be a capital investment in Kickers and/or Spiro, and not a repayable loan. While of course there can be an actionable misrepresentation incident to an investment or capital transaction, just as there can be one incident to a loan, the former, if nothing else inherently involves an element of agreed upon acceptable higher risk.

The totality of what happened afterward and the condoning and approving actions of Plaintiffs which belie a conclusion of fraud or misrepresentation in this proceeding may be summarized as: (1) the fact that the statements in Exhibit 7 as to what was to be done with the proceeds of the monies paid over by Plaintiffs were materially carried out soon afterward, and this Court's conclusion, hereafter noted, that to the extent they were not, such were not (a) sufficiently material and were adequately explained at least to the point that the Court cannot conclude there was a misrepresentation when made, and (b) Plaintiffs condoned and consented to such in any event; (2) the refinancing of the bank loan and its pay down contemplated by the transaction also proceeded to take place, including its structuring, at the apparent behest of one of the Plaintiffs, as a primary

liability of Debtor individually, went forward under circumstances where it was evident at the time that the loan balance was not going to be, at least then, reduced by the $1,000,000 referred to in Exhibit 7; (3) for a period of some six or seven months starting after the loan refinancing transaction was completed Plaintiffs were paid the monthly sums that were calculated in the beginning as being their required return on their "investment" all during a period where at least as far as the credible record before this Court is concerned, they did not complain, or raise the questions they are here asserting, and were fully aware of, or had access to, any and all information; (4) they apparently were willing to and in fact did "invest" additional monies which in retrospect they now call "stupid"; (5) when it later became necessary to revise the structure of the transaction from one of an equity investment to one of a loan transaction, and one which again had no apparent "loan" repayment terms or specifics, the parties were quite willing to do and did so, again without at the time at least insofar as this record shows, apparently raising any of the fraud issues being raised in this proceeding; in short, they were quite willing to then continue the then existing arrangement and specifically receive the sums being paid to Plaintiffs and the continued employment of Lentz's daughter.

In summary, the inevitable factual conclusions to be drawn from the totality of the record in this case are: (a) whatever terms or conditions expressed in Exhibit 7, which were not fully or tardily met, were either not adequately explained, or were not sufficiently material to the transaction, or if they were, were of no material concern to Plaintiffs who condoned or approved them; (b) Debtor did not in fact make any fraudulent misrepresentations arising out of Exhibit 7 which afford a basis for non-dischargeability, because at the time Debtor intended to carry out the indicated

13

11-05381-wsd    Doc 63    Filed 10/11/12    Entered 10/11/12 17:30:27    Page 13 of 17

arrangements; (c) what really eventually happened here is the result of events occurring many months subsequent to the claimed misrepresentations which were not related to them, but which were the result of economic and financial circumstances arising from the economy or other events which caused adverse consequences to the business and the ability of it to meet its obligations to Plaintiffs, its other creditors, and its principals.

As noted, Plaintiffs also assert that Debtor's intent to deceive is shown by (1) restructuring the payoff to Joey Stoyanovich; (2) Peter depositing the June 23rd $400,000 check into his personal bank account; and (3) Peter and Debtor taking out loans of $100,000 and $60,000, respectively, from Kickers. Recapping the specific evidence and the Court's conclusion on those points to the extent not previously addressed is the following:

(a)  Joey Stoyanovich also eventually received a significant amount of his Kickers' indebtedness. Although he was only paid $55,000 in 2006, the evidence shows Peter agreed to restructure the remaining debt so that Joey would be paid $50,000 every six months for the next three years. At the time of trial, Joey had been paid $280,000. Such a substantial partial payment is among other things inconsistent with the position that Debtor had an intent to deceive on this point when he presented the Offer Sheet.

(b) In regards to Peter depositing the June 23rd $400,000 check (made payable to "Kickers") into his personal bank account, the credible evidence shows that he initially deposited this check into his own account, but the funds were shifted into the Kickers' Fifth Third Bank account soon thereafter. The Fifth Third Bank June and July account statements strongly corroborate Peter's testimony that this is what took place, as they show that deposits were made into Kickers' Fifth Third Bank account of $25,000 on June

16th, $40,000 on June 22nd, $50,000 on June 23rd, and $270,000 on June 27th, totaling $385,000, as well as a number of other checks that came into Kickers' account, which might well have accounted for the remaining $15,000.

    (c) The $100,000 and $60,000 loans taken out of Kickers by Peter and Debtor, respectively, on September 8, 2006, do present a somewhat different issue. Exhibit 7 neither explicitly contemplated the possibility of making, nor explicitly negatives the ability to make, such loans. The specific subject was not mentioned in that document nor was there any definitive testimony on the subject, other than the facts such loans were made on the indicated dates and in the indicated amounts. There was no affirmative representation on the subject that might be argued was false. At best one might argue that there was some sort of silent fraud involved, i.e. at the time of Exhibit 7 Debtor intended making such loans but withheld that information from Plaintiffs, and, not only that, such should be considered as sufficiently material in light of all of the facts to make the entire two million dollar plus debt non-dischargeable. Other than possibly what one might try to infer from the fact that the loans were made fairly shortly after the agreement was struck, the totality of the evidence on this point requires conclusions that (1) there was no silent fraud here on the part of Debtor; (2) even if there were, it was not sufficiently material to the entire transaction to permit the conclusion sought by Plaintiffs; (3) these transactions were conducted in an atmosphere of disclosure and openness that belie any silent fraud; particularly when one considers the evidence that in fact Plaintiffs' personal relationships with Debtor and Peter, the very recipients of the loans, and their consequent desire to become part of their enterprise, played a large, if not dominant, role in their doing so; and to that extent lessened the role that any unaccounted

for misrepresentations, let alone these loan transactions played in the situation; and (4) it is entirely likely that at some early point Plaintiffs were or became aware of the loans and concluded, as they did with other aspects of the situation that in pure hindsight they now question, that such were not of a sufficiently important or actionable concern, and they moved forward and happily accepted and enjoyed the perceived and bargained for fruits of the arrangement. Plaintiffs have simply not shown by the required preponderance of the evidence that Debtor did not at the time intend to effectuate what is set forth in Exhibit 7, or that Debtor then harbored an unexpressed or secret intent, deceit, artifice or trick, to do otherwise.

Properly characterized, when all the evidence is taken into consideration, this is really a case about a good faith business deal between and among trusting friends and acquaintances which later turned sour by reason of subsequent events largely unrelated to any alleged initial representations or misrepresentations, if indeed there were in fact any such, and generally not within the control of the parties. While one cannot really blame Plaintiffs for attempting to on some basis recoup their losses, at least under the facts in this case, they cannot do so by attempting to do so, by retroactively turning the situation into the kind of fraud case *ab initio* the § 523(a)(2)(A) exception to discharge requires.

Given the foregoing and the Court's conclusion as to the failure of proofs on the part of Plaintiffs, as to the indicated fraud elements, the Court need not go into the other elements of a § 523(a)(2)(A) action the Plaintiffs are required to prove, i.e. justifiable reliance and proximate cause.

16
11-05381-wsd    Doc 63    Filed 10/11/12    Entered 10/11/12 17:30:27    Page 16 of 17

The Court is contemporaneously entering an order consistent with this opinion.

**Signed on October 11, 2012**

                                              /s/ Walter Shapero
                                       **Walter Shapero**
                                       **United States Bankruptcy Judge**